2020 IL App (1st) 181469-U

No. 1-18-1469

Order filed September 30, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 11670 |
| | ) | |
| MICHAEL MILHOUSE, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for burglary where the evidence presented was sufficient to prove his guilt beyond a reasonable doubt.

¶ 2    Following a bench trial, defendant Michael Milhouse was found guilty of burglary (720 ILCS 5/19-1(a) (West 2016)) and sentenced to eight years' imprisonment. On appeal, he contends that the State's evidence was insufficient to sustain his conviction because a witness's identification of him was unreliable. For the following reasons, we affirm.

¶ 3    Defendant was charged by indictment with three counts of burglary premised upon an incident that occurred on July 6, 2017. Count 1 alleged that defendant entered a detached garage, the property of Melissa Benavidez, with intent to commit a theft therein. Count 2 alleged that he entered a detached garage, the property of Juan Arocho, with the intent to commit a theft. Count 3 alleged that he entered Benavidez's vehicle with the intent to commit a theft.

¶ 4    At defendant's bench trial, Benavidez testified that as of July 2017 she lived with her husband, Arocho, in a condominium building on West 36th Street in Chicago. East of the building was a detached four-car garage. Benavidez owned two of the parking spots in that garage and parked her vehicle there.

¶ 5    Shortly after 10 a.m. on July 6, 2017, Benavidez was at work when she received a call from a neighbor, Gina Gonzalez, who told her that the garage had been broken into. Benavidez went to the garage. She saw that a window to her vehicle was shattered, and that shoes and clothing were missing from the vehicle. She spoke to police that day.

¶ 6    Benavidez explained that her condominium has a security camera system. After the burglary, she asked Patrick Briheart, the president of her homeowners' association, to check for camera footage of any "unusual activity" from July 6. Briheart subsequently e-mailed Benavidez a number of still photographs taken from security camera video footage. Benavidez identified People's Exhibits 1 through 5 as accurate copies of those photographs. Two of the photographs show an individual wearing a gray T-shirt and blue hat standing in an alley near the parking garage; the other three photographs show the same individual on a sidewalk, near the entrance to the condominium. Each of the photographs is time-stamped, with the earliest image at 9:59 a.m. and the last at 10:08 a.m. In the last image (People's Exhibit 5), the individual is shown carrying

items that were not visible in the prior photographs. Benavidez testified that she could not identify the person shown in the photos.

¶ 7    On July 28, 2017, Benavidez's husband, Arocho, called her and asked her to send him the photos that she had received from Briheart. On cross-examination, Benavidez acknowledged that she did not personally see anyone enter the garage on the date of the burglary.

¶ 8    Arocho testified that he was not at home at the time of the burglary. Shortly after the incident, he viewed the still photographs in People's Exhibits 1 through 5 on Benavidez's cell phone.

¶ 9    On July 28, 2017, Arocho was riding his bicycle about half a mile from his residence, when his attention was drawn to a person approaching him, who was riding a bicycle and holding onto a second bicycle. Arocho explained that the man's "baseball cap and his shirt that he had on * * * looked like the person that was on * * * my wife's cellphone." Arocho identified defendant as the man he saw. Arocho called Benavidez and then called police. Benavidez texted Arocho the images in People's Exhibits 1 through 5, which Arocho showed to police. Arocho got into a police car and briefly rode with police officers, until he pointed out defendant to them.

¶ 10    Sergeant Kennedy[1] testified that on July 28, 2017, he spoke with a man who showed him still photographs of an individual. The man told Kennedy that the person in the photographs broke into his garage. Kennedy radioed for assistance, and a police car with two officers arrived. Kennedy relayed to them a description of the person as a black male wearing a blue baseball hat, and a gray Cubs World Series T-shirt. About two blocks away, the officers stopped defendant, who was wearing a blue baseball hat and a gray Cubs World Series shirt. Kennedy observed that

---

[1] Kennedy's first name is not included in the trial transcript.

defendant was wearing the "exact same clothing as in the photo" that had been shown to him. One of the officers searched defendant and recovered a screwdriver. During Kennedy's testimony, video footage from Kennedy's body camera that recorded defendant's arrest (People's Exhibit 6) was played in court.

¶ 11    Christina Areizaga testified that on July 6, 2017, she was visiting her aunt's condominium residence on Dearborn and 35th Street. She drove into the alley behind the residence to move some things from her car into the garage, where her aunt had a parking space. As she was clearing items from her car, she heard a "loud bang" coming from inside the garage. She moved her car back because she believed that another vehicle was going to exit the garage. She explained that no vehicle emerged, but a "a couple minute[s] later the garage door opened and a man came out with pink bags." The man walked out of the alley and down the street.

¶ 12    Areizaga went into her aunt's house, told her "that someone left the garage door open" and asked her aunt if she had new neighbors. Her aunt responded "oh my God we have been robbed again." They went into the parking garage, saw that a vehicle's window was shattered, and contacted police.

¶ 13    On July 28, 2017, police contacted Areizaga. Before she was shown a photographic lineup, she was given an advisory form (People's Exhibit 7), which she signed to indicate her understanding of the form. She was shown an array of six photographs (People's Exhibit 8), and she circled a photograph of defendant, whom she recognized as the man she saw walking out of the garage. On the array, Areizaga signed her name and wrote: "I seen him walking out the garage." Areizaga also identified defendant in court.

¶ 14    On cross-examination, Areizaga acknowledged that, after she heard the "bang," she was waiting a "couple minutes" expecting a car to emerge. She agreed that, during that time, she was on her phone "texting or looking at the internet" before someone exited the garage.

¶ 15    Chicago police office Javier Vaneral testified that he investigated the burglary and spoke to Briheart about recovering video surveillance footage. Briheart was unable to provide Vaneral with video footage but e-mailed still photographs, People's Exhibits 1 through 5. On cross-examination, defense counsel asked Vaneral: "[W]hen you reviewed those photos, you did not find those photos clear enough to provide an identification of the suspect, correct?" Vaneral answered: "You can see but not enough for me to make an identification."

¶ 16    The parties stipulated that Briheart, if called to testify, would state that: he is the president of the condominium association including Benavidez's residence; he is familiar with the association's video surveillance system; People's Exhibits 1 through 5 were still photographs from video footage near the time that Areizaga observed someone exit the garage; and the actual video footage was not preserved. Following the stipulation, the court admitted into evidence People's Exhibits 1 through 8.

¶ 17    Defendant elected not to testify, and the defense did not present any evidence.

¶ 18    In closing argument, defense counsel argued that there was not sufficient identification evidence to find defendant guilty. Counsel suggested that Arocho could not have recognized defendant based on the still photos: "Judge, you are very well able to look at those photos yourself and observe that [defendant's] face and likeness are not able to specially be made out on those photos." Defense counsel also argued that Areizaga's testimony indicated that she could not clearly see the person who exited the garage, that the person "never made eye contact with

her" and she "never necessarily saw their face." Counsel also noted that defendant was arrested many days after the burglary, the State's witnesses had never met him before, and argued that they could not "make a solid identification."

¶ 19    The State argued that Arocho could recognize defendant from the still photographs, noting that defendant was wearing the same clothes on the date of his arrest. The State also emphasized that defendant was identified by Areizaga and argued that there was no suggestion from her testimony "that she didn't have the opportunity to see him."

¶ 20    In finding defendant guilty, the court stated that it had reviewed the record and made the following findings:

> "There was a garage burglary * * * part of this was captured on surveillance video that was available from the alley and you can see the burglar with distinctive clothing walking away from the scene with some materials.
>
> The person living with the person that had been burglarized thought he saw someone consistent with what he had seen on the video * * * on a subsequent date, made sure that he looked like the same person and called the police. They did apprehend [defendant] wearing the same clothes that the burglar was wearing * * *. In court he was also identified by a woman that was waiting outside her garage and was startled when she heard some noise and saw [defendant] walking out of a garage."

In finding defendant guilty on all counts, the court stated: "I find the witnesses to be credible and compelling about their identification with the corroboration of the video and the clothing as well."

¶ 21    Defendant's motion for a new trial was denied. After noting defendant's "lengthy" criminal history, which included prior convictions for burglary and retail theft, the trial court sentenced him to eight years' imprisonment on a single count of burglary (count 1).

¶ 22    On appeal, defendant contends that the State failed to prove his guilt beyond a reasonable doubt because there was insufficient identification evidence. Specifically, defendant claims that Areizaga's identification testimony was unreliable, and was not corroborated by any physical evidence. On that basis, he requests reversal of his conviction and sentence.

¶ 23    "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). In a bench trial like the instant case, "it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefore, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). "The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. "Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. [Citation.]" *Id.* ¶ 72.

¶ 24    In this case, to prove defendant guilty of burglary, the State had to prove that he, without authority, "knowingly enter[ed] or without authority remain[ed] within a building * * * with intent to commit therein a felony or theft." 720 ILCS 5/19-1(a) (West 2016). In this court,

defendant contests only the sufficiency of the identification evidence, rather than any particular element of the offense.

¶ 25    "Identification evidence which is vague or doubtful is insufficient to support a conviction. [Citation.] A single witness's identification of the accused, however, is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47.   Our court has explained:

> "In assessing identification testimony, we consider the following five factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972): (1) the witness' opportunity to view the defendant during the offense; (2) the witness' degree of attention at the time of the offense; (3) the accuracy of the witness' prior description of the defendant; (4) the witness' level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification. [Citation.]" *Id.*

None of these factors alone is dispositive; "rather the trier of fact is to take all of the factors into consideration. *Id.* (citing *Biggers*, 409 U.S. at 199-200). Notwithstanding these factors, we keep in mind that "[e]yewitness testimony is insufficient only if the record compels the conclusion that no reasonable person could accept the testimony beyond a reasonable doubt." *People v. Charles*, 2018 IL App (1st) 153625, ¶ 25.

¶ 26    Defendant suggests that the five *Biggers* factors weigh against the reliability of Areizaga's identification. Nevertheless, in considering the *Biggers* factors in relation to Areizaga's identification, we conclude that they weigh in the State's favor.

¶ 27    With respect to the first factor, defendant claims that Areizaga lacked sufficient opportunity to view the suspected burglar. Based on her testimony that she saw a man walk out

of the garage and exit the alley, defendant contends that "the suspect's back was turned" to Areizaga, and that there was insufficient time for her to observe his features. However, at no point did Areizaga testify that the burglar's back was turned to her, or that she was unable to see his face. Further, as the State points out, even identifications made during brief encounters may be found credible. See, *e.g.*, *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification testimony credible even when "the entire incident took less than one minute") (citing *People v. Parks*, 50 Ill. App. 3d 929, 932-33 (1977) (identification from attack lasting "five to ten seconds" sufficient to sustain conviction))).

¶ 28     With respect to the second factor, defendant argues that Areizaga did not have a high degree of attention. Defendant emphasizes her testimony that she was looking at her phone in the time between she heard a "bang" and when she saw a man exit the garage. Defendant also argues that Areizaga's testimony indicates that she did not suspect the man was a burglar, but had "assumed [he] was one of her aunt's neighbors" leaving the garage. While Areizaga acknowledged that she was looking at her phone *before* she saw defendant, at no point in her testimony did she suggest that her phone distracted her from observing him once he exited the garage. Further, to the extent Areizaga testified that she proceeded to question her aunt as to whether the man was a new neighbor, the factfinder could just as easily interpret this as evidence of *greater* attention, *i.e.*, that seeing an unfamiliar person concerned her to the extent that she asked her aunt.

¶ 29     With respect to the third factor, defendant emphasizes that Areizaga's trial testimony did not describe the physical features of the man she observed, and the State did not present evidence of any description that Areizaga provided to police. Nonetheless, the lack of detailed description

testimony did not prevent the court from crediting her identification. "[A] witness is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." *People v. Slim*, 127 Ill.2d 302, 308-09 (1989). "The presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made. [Citation.]" *Id*. Areizaga selected defendant's photo in an array of six; she also identified defendant at trial. The trial court found her identification testimony credible, and we will not usurp the trial court's finding merely because she could have offered more detail. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶¶ 51-52 (in addressing third *Biggers* factor, rejecting claim that witness description was too vague where trial court credited witness' testimony that he made a positive identification and "recognized defendant's face").

¶ 30    Similarly, we reject defendant's suggestion that Areizaga's identification was unreliable under the fourth *Biggers* factor, the witness' level of certainty. Defendant contends there is "nothing in the record to reflect the level of certainty" in Areizaga's identification, and that the State "failed to establish [her] level of confidence" in identifying him as the person she saw leaving the garage. However, there is no requirement that an eyewitness quantify her level of certainty. In any event, Areizaga did not waver and was consistent in her identification, both with respect to the photo array and at trial. See, *e.g*., *People v. Green*, 2017 IL App (1st) 152513, ¶ 112 (in addressing fourth *Biggers* factor, noting that witness "never wavered" and was "consistent in his identification of defendant as the shooter" in photo array and physical lineup).

¶ 31    Also, with respect to the fourth factor, defendant urges that we consider the "scientific consensus in the area of eyewitness identification reveal[ing] a weak correlation between confidence and accuracy." However, as this scientific argument was not presented to the trial court, through expert testimony or otherwise, we need not address it. See *Tomei*, 2013 IL App (1st) 112632, ¶ 56 (rejecting argument that fourth factor should be given "little weight" due to "low correlation" between a witness' confidence and the accuracy of identification; "[s]ince defendant did not present expert testimony, we do not find defendant's argument persuasive that the fourth factor, the witness' level of certainty should be given little weight.").

¶ 32    Regarding the fifth and final factor, the length of time between the crime and the identification, we acknowledge that three weeks passed between the burglary and Areizaga's photo array identification. However, that time period did not preclude the trial court from crediting the identification, especially as "reviewing courts have found identifications reliable where nearly three months or more elapsed between the crime and the witness' identification." *Green*, 2017 IL App (1st) 152513, ¶ 113; see also *In re N.A.*, 2018 IL App (1st) 181332, ¶ 31 (period of one month between robbery and identification was "no reason to upend the trial court's determination," as "we have upheld positive identifications involving considerably longer lapses in time. [Citation.]"). In short, after considering the *Biggers* factor, we conclude that the trial court could reasonably find Areizaga's identification to be credible and reliable.

¶ 33    This is especially so where the State presented additional evidence, including five photographs from video surveillance (People's Exhibits 1 through 5) showing a person near the garage on the morning that the burglary took place, wearing a blue hat and gray Cubs World Series T-shirt. Consistent with the testimony of Arocho and Kennedy, body camera footage

(People's Exhibit 6) confirms that defendant was wearing the same type of hat and shirt on the date of his arrest, approximately half a mile from the site of the burglary. The trial court viewed these exhibits and found that defendant was wearing the "same clothes that had been worn on the date of the burglary." Viewing the evidence in the light most favorable to the State, a reasonable factfinder could certainly find this evidence corroborated Areizaga's independent identification of defendant.

¶ 34 Moreover, we reject defendant's suggestion that, even assuming that he was the person who appeared in the photographs, they could not support conviction because they did not show him entering the garage or doing anything illegal. That argument ignores the additional circumstantial evidence supporting the reasonable inference that he was the burglar, including Areizaga's testimony that she heard a loud bang and saw defendant exit the garage with bags shortly thereafter. A finder of fact "is not required to disregard inferences that flow normally from the evidence, seek all possible explanations consistent with innocence and elevate them to reasonable doubt, or find a witness not credible merely because the defendant says so." *Charles*, 2018 IL App ( 1st) 153625, ¶ 25. It was the responsibility of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony, and to resolve any inconsistencies and conflicts in the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not substitute our judgment for that of the trier of fact on these matters. *Id.* As mentioned, this court will reverse a defendant's conviction only when the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *Siguenza-Brito*, 235 Ill. 2d at 225. This is not one of those cases.

¶ 35 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.