2023 IL App (1st) 230373-U

No. 1-23-0373

Third Division
December 20, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* J.S., a Minor | ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, Petitioner-Appellee, | ) ) ) | No. 22 JD 00998 |
| v. | ) ) | The Honorable Sanju Oommen-Green, |
| J.S., Respondent-Appellant). | ) ) ) | Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1     *Held:* The trial court's adjudication of delinquency and its finding that respondent was a violent juvenile offender are affirmed where the trial court's findings were not against the manifest weight of the evidence and the State provided sufficient evidence to establish respondent's eligibility to be sentenced as a violent juvenile offender.

¶ 2     After a bench trial, respondent J.S., a 17-year-old[1] minor, was found guilty of

---

[1] We note that one of respondent's claims on appeal is that the State failed to prove his age at trial. While we consider his claim in our analysis below, the record establishes that respondent was, in fact, 17 years old at the time at issue.

(1) aggravated vehicular hijacking (720 ILCS 5/18-4(a)(4) (West 2020)), (2) vehicular hijacking (*id.* § 18-3), (3) possession of a stolen vehicle (625 ILCS 5/4-103(a)(1) (West 2020)), and (4) aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1) (West 2020)), and was adjudicated a delinquent minor pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)). On appeal, respondent contends that the State failed to prove him guilty beyond a reasonable doubt on the vehicular hijacking, aggravated vehicular hijacking, and AUUW charges and further claims that the State presented insufficient evidence regarding respondent's eligibility to be sentenced as a violent juvenile offender. For the reasons that follow, we affirm the trial court's adjudication of delinquency, as well as its finding that respondent was a violent juvenile offender.

¶ 3                                    BACKGROUND

¶ 4        In July 2022, the State filed a petition for adjudication of wardship, alleging that respondent had committed numerous offenses, including aggravated vehicular hijacking, vehicular hijacking, possession of a stolen vehicle, two counts of AUUW, and unlawful possession of a firearm, during a July 10, 2022, incident in which respondent allegedly took a motor vehicle from victim Reesa Schreier while armed with a firearm. The State also filed a notice that it intended to prosecute respondent as a violent juvenile offender pursuant to section 5-820 of the Act (705 ILCS 405/5-820 (West 2020)). At his arraignment, respondent, through counsel, stipulated to the juvenile court's jurisdiction, and the matter proceeded to a bench trial.

¶ 5        The evidence at trial established that, at approximately 11 a.m. on July 10, 2022, Schreier returned to her home on the 2200 block of North Orchard Street in Chicago and pulled her vehicle—a white Audi SUV—into her garage. After she arrived, she took trash from the vehicle and walked to the garbage bins directly outside the garage to throw it out. When she

2

did so, she observed "two boys" walking northbound in the alley towards her. Schreier "didn't think much of it," as high school students passed through the alley "all the time," so she threw out her trash and returned to the vehicle, intending to remove her daughter's backpack from the trunk. As the boys reached her garage, they entered, displaying a handgun. Schreier observed that one boy was "smaller" and shorter, with a narrow face, and was wearing a tan hoodie with the hood pulled over his head. The other boy was "bigger," with a wider face and smaller eyes, and was wearing a black hoodie, as well as a mask under his nose; Schreier identified respondent in court as the bigger boy. Schreier could not recall which boy was displaying the handgun, but testified that it was "a small black gun" which "almost looked like a toy"; when asked to estimate its size, Schreier testified that "[i]t would fit inside an eight-by-ten piece of paper." The smaller boy ordered her to give him her cell phone and passcode, which she did. One of them then asked for her " 'stuff,' " meaning her purse and keys, then respondent entered the vehicle and started the engine; the other boy sat in the passenger seat. Schreier moved to the side so they would not strike her with the vehicle, and they pulled the vehicle out of the garage and drove northbound down the alley.

¶ 6        During Schreier's testimony, she identified herself and the two boys in video footage of the incident, and the video was admitted into evidence over the objection of respondent's counsel. The video footage, which is in the form of a series of still images, depicts a white Audi SUV entering a garage which appears to be next door to the location of the video camera. A woman then appears from the garage entrance and stands near the trash cans directly outside the garage; approximately two houses down are two individuals, one shorter and wearing a light brown or gold hoodie with the hood pulled over his head and the other wearing a black hoodie with the hood pulled over his head and appearing to be masked. The woman places

something inside the trash can, then turns in the direction of the two individuals as she returns inside the garage; at this point, the two are approximately one house away. The woman disappears from view, while the two individuals continue down the alley until they are across from the garage; the individual wearing the light brown hoodie looks in the direction of the garage before turning back to the other individual. The two individuals turn toward the garage and enter it. As they enter the garage, the individual in the black hoodie raises an arm; while the image is grainy, it appears that he is holding an object in his hand. The two individuals then disappear from view, after which the white Audi SUV exits the garage and drives down the alley.

¶ 7          After the boys left, Schreier called 911 and Officer Donald Simmons responded to her home. Upon speaking with Schreier and receiving a description of the vehicle, he sent out a "flash message" with the vehicle information on the police radio. At approximately 2 p.m., Officer Jordan Casey was on patrol near 142 North Clark Street in a marked police vehicle when he heard a message over the radio which indicated that the Audi SUV was traveling southbound on Clark Street. Soon afterwards, he observed the vehicle approaching from the north, traveling southbound on Clark Street, and he followed the vehicle; once backup arrived, he curbed the vehicle. When he approached the vehicle, Casey observed three individuals inside; the driver was an African-American male, the passenger was an African-American female, and the third occupant could not be viewed in detail until Casey opened the door. Casey identified respondent in court as the individual who was driving the vehicle. Casey ordered respondent to place his hands out the window, which he did, and respondent was removed from the vehicle and handcuffed without incident. When he searched the vehicle, Casey recovered a small handgun under the front passenger seat; the handgun was a three- to four-inch revolver

4

which was dark in color and had electrical tape on its handle. Casey estimated that the front passenger seat was "[w]ithin arm's length," or four to five feet, from the driver's seat.

¶ 8    During his testimony, Casey testified that he was wearing a body camera at the time of the arrest, and video from the arrest was admitted into evidence. In the video, when the back driver's side door is opened, there is a car seat on the back seat, with what appears to be an object of black clothing on top. The video also depicts the license plate of the vehicle, which matches the license plate of Schreier's vehicle, and when Casey opens the glove compartment, there is a piece of paper with "Schreier" clearly visible.

¶ 9    Casey testified that he learned respondent's age during processing, but the trial court sustained respondent's counsel's objections to questions which sought to elicit testimony as to respondent's age. Casey testified that respondent "originally told us he was 18," but that "[h]is real age came out later," when respondent was being processed. Once processing was completed, Casey testified that "[t]he guards in the prison moved him over to the juvie room," and testified that someone would be moved to the "juvie room" "[b]ecause they're not an adult 18 years or older."

¶ 10    The same evening, Schreier visited the police station, where she viewed a photo array to identify the individuals who had taken her vehicle. Schreier identified both boys in the photo array. While she was able to identify the smaller boy quickly, Schreier took 20 to 30 seconds to identify the bigger boy, and stated that she was " 'not a hundred percent sure,' " as he was wearing a hoodie at the time of the incident.

¶ 11    After the State rested, respondent's counsel made a motion for a directed finding, arguing that the State had failed to prove its case beyond a reasonable doubt. The trial court granted respondent's motion with respect to one of the counts for AUUW and unlawful possession of

a firearm. Respondent did not present any evidence in his defense and the trial court ultimately found respondent guilty of aggravated vehicular hijacking, vehicular hijacking, possession of a stolen vehicle, and AUUW.

¶ 12   In its findings, the trial court noted that the State had not presented any evidence of respondent's exact age, but that Casey had testified that respondent was placed into a juvenile lockup area. The trial court additionally found that it could take judicial notice of the fact that it was a juvenile court, and that, "[i]t is a well-known fact established by law that the Juvenile Court's jurisdiction ends upon the 21st birthday of anybody who appears before the Court." As respondent had stipulated to the jurisdiction of the juvenile court, the trial court found that it would take judicial notice "that he's under the age of 21," despite the State's failure to prove respondent's exact age.

¶ 13   At the dispositional hearing, the State sought to admit a document evidencing a prior guilty plea in a different case, in support of its allegations as to respondent's violent juvenile offender status; respondent's counsel indicated she had no objection to the document, which the State characterized as "self-authenticating," and the trial court admitted the document into evidence. The document is described as a sentencing order, and indicates that, on July 15, 2021, respondent was adjudicated a ward of the court in case No. 20 JD 1243; the order does not indicate the offense for which respondent was found guilty. Before the trial court, however, the State indicated that respondent had been found guilty of robbery involving the use or threat of force, which was a Class 2 offense, for an incident occurring on December 15, 2020. Additionally, a social investigation report prepared by respondent's probation officer listed the "offense" in case No. 20 JD 1243 as "Armed Robbery, Agg. Robbery, Robbery."

¶ 14    In sentencing respondent, the trial court found that it had "no flexibility" under the statute and adjudicated respondent a ward of the court, committing him to the custody of the Department of Juvenile Justice for an indeterminate period of time until his 21st birthday. This appeal follows.

¶ 15                                    ANALYSIS

¶ 16    On appeal, respondent claims that the State failed to prove him guilty beyond a reasonable doubt where (1) Schreier's identification was unreliable and (2) the State failed to prove respondent's age or that he was in possession of a firearm. Respondent additionally claims that the trial court erred in sentencing him as a violent juvenile offender, as the State failed to prove his eligibility for such a sentence.

¶ 17                             *Sufficiency of Evidence*

¶ 18    Respondent's arguments concerning his delinquency adjudication all involve challenges to the sufficiency of the evidence. After filing a delinquency petition, the State must prove the elements of the substantive offense charged beyond a reasonable doubt. *In re Ryan B.*, 212 Ill. 2d 226, 231 (2004); *In re W.C.*, 167 Ill. 2d 307, 336 (1995). Thus, "[a] reviewing court will not overturn a trial court's delinquency finding 'unless, after viewing the evidence in the light most favorable to the State, no rational fact finder could have found the offenses proved beyond a reasonable doubt.' " *In re T.W.*, 381 Ill. App. 3d 603, 608 (2008) (quoting *In re Gino W.*, 354 Ill. App. 3d 775, 777 (2005)). The trier of fact is in the best position to judge witness credibility, as it had the opportunity to see and hear the witnesses, and a reviewing court " 'must allow all reasonable inferences from the record in favor of the prosecution.' " *People v. Austin M.*, 2012 IL 111194, ¶ 107 (quoting *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). When considering the sufficiency of the evidence, it is not the function of the reviewing court to retry

the respondent, and we will reverse a conviction only if the evidence "is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of [the respondent's] guilt." *Id.*

¶ 19    In this case, respondent was charged with, and ultimately found guilty of, aggravated vehicular hijacking, vehicular hijacking, possession of a stolen vehicle, and AUUW. On appeal, respondent does not challenge the trial court's finding as to the possession of a stolen vehicle count but challenges only the remaining three charges. In order to prove the charge of vehicular hijacking, the State was required to establish that respondent knowingly took the Audi SUV from the person of Schreier by threatening the imminent use of force. See 720 ILCS 5/18-3(a) (West 2020). For aggravated vehicular hijacking, the State was required to prove that the vehicular hijacking was committed while respondent was armed with a firearm. 720 ILCS 5/18-4(a)(4) (West 2020). Finally, to prove the charge of AUUW, the State was required to establish, in relevant part, that respondent knowingly carried a firearm in a vehicle, that he was under the age of 21, and that he was not engaged in lawful activities under the Wildlife Code (520 ILCS 5/1-1 *et seq.* (West 2020)). 720 ILCS 5/24-1.6(a)(1); (a)(3)(I) (West 2020).

¶ 20    *Witness Credibility*

¶ 21    Respondent first contends that the State failed to prove that he was guilty of vehicular hijacking or armed vehicular hijacking where Schreier's identification testimony was unreliable. The State has the burden of proving the identity of the person who committed the crime beyond a reasonable doubt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989); *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 20. A single witness' identification is sufficient to sustain a conviction if the witness viewed the accused under circumstances which permitted a positive identification, but a "vague or doubtful" identification will not be deemed sufficient.

*Slim*, 127 Ill. 2d at 307; *In re O.F.*, 2020 IL App (1st) 190662, ¶ 29. " 'An identification may be positive even though the witness viewed the accused for a short period of time,' and '[t]he sufficiency of the opportunity to observe is for the trier of fact to determine.' " *In re O.F.*, 2020 IL App (1st) 190662, ¶ 29 (quoting *People v. Wehrwein*, 190 Ill. App. 3d 35, 39-40 (1989)).

¶ 22    In determining whether an eyewitness identification is reliable, Illinois courts consider five factors, first set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199 (1972), and commonly known as the "*Biggers* factors." See *Slim*, 127 Ill. 2d at 307-08 (adopting *Biggers* factors). These factors require assessment of (1) the opportunity the witness had to view the offender at the time of the offense, (2) the witness' degree of attention, (3) the accuracy of any prior description by the witness, (4) the level of certainty demonstrated by the witness at the identification procedure, and (5) the length of time between the crime and the identification confrontation. *Id.*; *In re N.A.*, 2018 IL App (1st) 181332, ¶ 22. While the first factor has been said to be the "most important" factor (see, *e.g.*, *Wehrwein*, 190 Ill. App. 3d at 39; *In re O.F.*, 2020 IL App (1st) 190662, ¶ 32), all factors must be considered, and no single factor conclusively establishes the reliability of the eyewitness' testimony. *In re O.F.*, 2020 IL App (1st) 190662, ¶ 32.

¶ 23    With respect to the first factor, the opportunity the witness had to view the offender at the time of the offense, we find that this factor weighs in favor of reliability. The incident occurred at approximately 11 a.m. on a clear July day, meaning that there were no apparent issues concerning visibility, such as darkness, rain, or snow. See *In re A.A.*, 2023 IL App (1st) 221538, ¶ 19 (in finding that opportunity to view the offender favored reliability, noting that the weather was clear and there was no evidence of visibility issues); *In re O.F.*, 2020 IL App (1st) 190662, ¶ 37 (in finding that opportunity to view offender weighed against reliability, noting that, while

the incident occurred at 10:42 a.m., it was "not a bright, clear day" but instead was cloudy and rainy and both the offender and the witness were inside vehicles which would have had water accumulation on the windows). Schreier testified that she initially observed "two boys" walking down the alley while she was throwing trash into the trash can, although she paid them little attention at the time. Shortly thereafter, however, both boys entered her open garage and demanded her cell phone and vehicle at gunpoint. Schreier testified that she handed the "smaller" boy her cell phone, which suggests that she was relatively close to the boy, and was also close enough to the vehicle as the boys drove it from the garage that she needed to move out of its way so that it would not strike her. Schreier was able to provide descriptions of both individuals, including the type of clothes they were wearing, their relative size, and their facial features. While, as respondent notes, the encounter only lasted approximately one minute and the "bigger" boy was partially masked at the time, we nevertheless find that this factor weighs in favor of reliability, especially where Schreier testified that the mask was only pulled up to below the bigger boy's nose. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 30 (finding that an encounter lasting seconds could properly be credited by the trial court as a sufficient opportunity to observe the offender); *People v. Luellen*, 2019 IL App (1st) 172019, ¶ 65 (finding that first factor "strongly" weighed in favor of reliability where the witness twice observed the victim in close proximity and in adequate lighting, even where encounter was not lengthy); *In re A.A.*, 2023 IL App (1st) 221538, ¶ 20 (rejecting the respondent's argument that the offender's heavy winter clothing prevented an adequate opportunity to view, as the respondent's face "was at least partially visible" during their interaction).

¶ 24 We similarly find that the second factor, the witness' degree of attention, favors reliability. Respondent claims that this factor weighs against reliability, given the stress of the situation,

the display of a firearm, and the presence of two offenders. We do not find this argument persuasive. As noted, despite the stress of the situation, Schreier had the presence of mind to be able to observe a number of details surrounding the encounter, to which she subsequently testified, including descriptions of each of the offenders, what they said, and what she did in response. While she was unable to recall which boy was holding the firearm, she was nevertheless able to provide a description of the firearm, including that it was "a small black gun" which "almost looked like a toy." Moreover, despite respondent's contention to the contrary, this was also not a situation such as that present in *In re O.F.*, in which the witness was not paying attention to the offender during his only opportunity to observe him. See *In re O.F.*, 2020 IL App (1st) 190662, ¶¶ 43-46 (witness' "self-described lack of attention to the [offender's vehicle] in the moments he had to view the driver within" meant that the second factor "weighs heavily" against reliability). Here, while Schreier "didn't think much of it" when she initially observed the boys, as high school students passed through the alley "all the time," her opportunity to view the offenders was not limited to their passage through the alley—she interacted with them directly once they entered her garage and demanded her possessions. We therefore find that the second factor weighs in favor of reliability. See *People v. Malone*, 2012 IL App (1st) 110517, ¶ 33 (finding second factor weighed in favor of reliability where witness' "high degree of attention" was demonstrated by her "detailed recollection" of what the defendant did from the time he entered the store until he brandished a firearm, took money from the register, and fled); *In re A.A.*, 2023 IL App (1st) 221538, ¶ 21 (rejecting the respondent's claim that the witness' low level of engagement demonstrated his lack of attention, where his "level of attention was high" during his subsequent encounter with the respondent, which occurred after he was attacked).

¶ 25      As to the third factor, the accuracy of any prior description by the witness, this factor is neutral, as there is no evidence in the record on appeal as to Schreier's prior descriptions of the offender. See *Malone*, 2012 IL App (1st) 110517, ¶ 34 (witness did not testify to any prior descriptions she gave of the defendant); *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 58 (where it was unclear whether witnesses were asked to give descriptions prior to viewing a lineup, third factor "weighs neither for nor against reliability"). We cannot agree with respondent's claim that this factor weighs against reliability since his clothing at the time of his arrest was not the same as the clothing that Schreier testified she observed. First, the description that Schreier gave during trial was consistent with the appearance of the offender in the video of the incident, although she did not have an independent recollection of the color of the offender's shoes. Additionally, while respondent's appearance at the time of his arrest—specifically his shoes and his t-shirt—did not match Schreier's description exactly, this does not mean Schreier's description was inaccurate. As the trial court observed, there was a piece of black-colored clothing in the back seat of the SUV, which could have been the black hoodie Schreier testified she observed. Moreover, there were several hours between the time of the incident and the time of respondent's arrest, so respondent would have had an opportunity to change clothes. We therefore cannot agree with respondent that this factor weighs against the reliability of Schreier's identification.

¶ 26      Finally, with respect to the fourth and fifth factors, the level of certainty demonstrated by the witness at the identification procedure and the length of time between the crime and the identification confrontation, we find that these factors weigh in favor of reliability. Schreier viewed a photo array the same evening as the incident, and was able to identify respondent as the "bigger" boy. Despite respondent's contention to the contrary, we cannot find that

Schreier's initial hesitation in identifying respondent from the photo array means that this factor weighs "strongly" against reliability. While Schreier took longer to identify respondent than his co-offender, and indicated that her hesitation was due to his wearing a hoodie at the time of the incident, Schreier was nevertheless able to make a positive identification of respondent from the photo array, and positively identified him at trial. Even accepting respondent's position, at most, this factor would be neutral or weigh slightly against reliability, but would not be outweighed by the strength of the factors weighing in favor of reliability.

¶ 27    In sum, considering all of the *Biggers* factors, and weighing the evidence in the light most favorable to the State, Schreier's testimony was sufficiently reliable that a rational trier of fact could have properly accepted her identification of respondent as the "bigger" boy involved in the incident in her garage. Accordingly, we affirm the trial court's adjudications of delinquency with respect to the charges of vehicular hijacking and aggravated vehicular hijacking.

¶ 28                            *Possession of Firearm*

¶ 29    Respondent also contends that the State failed to prove him guilty of AUUW where it failed to prove that he possessed a firearm. To prove the charge of AUUW, the State was required to establish that respondent knowingly carried a firearm in a vehicle.[2] 720 ILCS 5/24-1.6(a)(1) (West 2020). Respondent claims that the evidence did not establish that he possessed the firearm recovered from the vehicle, where he was the driver and the firearm was recovered from underneath the passenger seat.

---

[2] We note that the AUUW statute provides that an individual violates the statute when he "[c]arries [a firearm] on or about his person or in any vehicle" (720 ILCS 5/24-1.6(a)(1) (West 2020)). As such, the State makes an argument that the video, which arguably shows respondent holding a firearm, establishes actual possession of the firearm by respondent. The State's delinquency petition, however, did not allege possession "on or about his person" but solely alleged that respondent carried a firearm "in [a] vehicle." Accordingly, we consider only whether the evidence established possession of the firearm in the vehicle.

¶ 30 Possession of a firearm may be either actual or constructive. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27; see also *People v. Wise*, 2021 IL 125392, ¶¶ 24-25. Actual possession is "the exercise by the defendant of present personal dominion over the illicit material and exists when a person exercises immediate and exclusive dominion or control over the illicit material." *People v. Givens*, 237 Ill. 2d 311, 335 (2010); see also *Jones*, 2019 IL App (1st) 170478, ¶ 27 ("Actual possession is proved by testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person, tried to conceal it, or was seen to discard it."). Constructive possession, by contrast, may be shown " 'where the person has knowledge of the presence of the weapon and exercises immediate and exclusive control over the area where the firearm is found.' " *Wise*, 2021 IL 125392, ¶ 25 (quoting *People v. Brown*, 2020 IL 124100, ¶ 11). Whether a defendant had possession of contraband is a factual issue, and we will not disturb the findings of the factfinder "unless the evidence is so unbelievable that it creates a reasonable doubt as to the defendant's guilt." *Jones*, 2019 IL App (1st) 170478, ¶ 27.

¶ 31 In this case, the firearm was recovered from underneath the passenger seat of Schreier's Audi SUV, which respondent was driving. Respondent, however, maintains that the distance between the driver's seat and the location of the firearm, as well as the fact that there were two other passengers in the vehicle, demonstrate that he did not have constructive possession of the firearm.

¶ 32 To establish constructive possession, the State must prove that respondent (1) knew a firearm was present and (2) exercised immediate and exclusive control over the area where the firearm was found. *Wise*, 2021 IL 125392, ¶ 28. Constructive possession is typically proven entirely through circumstantial evidence, and the knowledge element is "rarely shown by direct

proof." *People v. Smith*, 2015 IL App (1st) 132176, ¶ 26. Here, respondent's knowledge is readily established, despite respondent's contentions to the contrary. While respondent maintains that a defendant's mere presence in a vehicle, without more, does not establish knowledge of the presence of a firearm (see *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002)), in this case, there is more than merely respondent's presence inside the vehicle. Respondent was identified by Schreier as one of two individuals who took her vehicle at gunpoint, meaning that there is evidence that a firearm was present inside the vehicle, as respondent drove away in the vehicle after the incident and was arrested while driving the same vehicle. Despite the passage of several hours between the time of the incident and the time of the arrest, a rational trier of fact could have found that respondent knew a firearm was present in the vehicle, given its earlier use. See *Smith*, 2015 IL App (1st) 132176, ¶ 26 (the State may prove knowledge by "offering evidence regarding the defendant's acts, statements or conduct from which a fact finder may infer that the defendant knew of the weapon's presence").

¶ 33       Additionally, the fact that respondent had control over the vehicle in which the firearm was found is probative with respect to proving exclusive control of the area in which the firearm was located (*People v. Robinson*, 233 Ill. App. 3d 278, 287 (1992); *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 32), even though the presence of passengers means that he is not necessarily in possession of everything within the passenger area (*People v. McIntyre*, 2011 IL App (2d) 100889, ¶ 17). With respect to the element of control, "the rule that possession must be exclusive does not mean *** that the possession may not be joint." *Givens*, 237 Ill. 2d at 335. If two or more people share the intention and power to exercise control, then each has possession. *Id.*; *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000). Thus, the fact that there were

passengers in the vehicle does not mean that respondent did not exercise immediate and exclusive control over the area in which the firearm was found.

¶ 34    Here, the evidence demonstrated that the firearm was discovered beneath the front passenger seat, which was "[w]ithin arm's length" of the driver's seat, according to Casey, not in a location which would be difficult for respondent to reach.[3] See, *e.g.*, *Wise*, 2021 IL 125392, ¶ 34 (no control where firearm was 5 to 10 feet away from the driver, in the third-row passenger seat of a minivan, and the officer did not believe the defendant could reach the firearm from the driver's seat); *McIntyre*, 2011 IL App (2d) 100889, ¶ 18 (no control where firearm was found in an opening between the plastic base of the front passenger seat and the leather portion of the seat, on the side of the seat closest to the front passenger door). Given respondent's control over the vehicle generally, coupled with the presence of the firearm in a nearby location, a rational trier of fact could have found that respondent had constructive possession of the firearm. Accordingly, we cannot find that the State failed to establish the element of possession of a firearm.

¶ 35                                *Age*

¶ 36    Respondent next contends that the State failed to prove him guilty of AUUW where it failed to establish his age. As noted, to prove the charge of AUUW, one of the elements that the State was required to prove was the fact that respondent was under the age of 21. 720 ILCS 5/24-1.6(a)(1); (a)(3)(I) (West 2020). A respondent's age is typically established when the

---

[3] Respondent maintains that it would have been "extremely difficult, if not impossible" for respondent to access the gun, given the presence of the center console and his contention that the firearm was discovered "far back under the front passenger seat." We review the evidence in the light most favorable to the State, however, and in doing so, cannot agree with defendant's characterization of the evidence. While the body camera video showed the presence of a center console and that Casey reached under the seat to retrieve the handgun, we cannot find that the evidence demonstrates that it would have been "extremely difficult, if not impossible" for someone in the driver's seat to reach the firearm.

State introduces a certified birth record, offers the testimony of a close relative of the respondent during the trial, or offers the testimony of a police officer regarding the respondent's response to inquiries concerning his age. *In re S.M.*, 2015 IL App (3d) 140687, ¶ 16. In this case, the State did not present any evidence of respondent's actual age, introducing only Casey's testimony that respondent "originally told us he was 18," but that "[h]is real age came out later," when respondent was being processed, and he was moved to the "juvie room," where an individual would be placed "[b]ecause they're not an adult 18 years or older." The trial court relied on Casey's testimony as to respondent's initial representation of his age and his presence in the "juvie room," but also found that it could take judicial notice of the fact that it was a juvenile court and that respondent had stipulated to juvenile jurisdiction. Respondent claims that the trial court was unable to take judicial notice of these facts, given that it did so after the close of evidence, and therefore, the State failed to prove that he was under the age of 21. We do not find this argument persuasive.

¶ 37    First, respondent dismisses Casey's testimony entirely, claiming that the trial court "determined the State's evidence concerning [respondent's] age was insufficient" and so felt the need to take judicial notice of its own jurisdiction. This characterization of the trial court's findings, however, is not supported by the record on appeal. In discussing the AUUW count, the trial court expressly noted that, with respect to the age issue, the State did not provide evidence of respondent's exact age, "but did ask the officer, who indicated that he learned the minor's age after fingerprinting the minor, and then after that, the minor, who initially said he was 18 years old, was removed and put into a juvenile lockup." The trial court did not make any comments suggesting that this testimony was insufficient to establish that respondent was under the age of 21, and the fact that the trial court chose to set forth an additional basis for

determining respondent's age in no way means that "the trial court did not believe this evidence was sufficient," as respondent claims. Thus, regardless of the judicial notice issue, there was evidence presented that would enable a rational trier of fact to conclude that respondent was under the age of 21, given his initial representation that he was 18 years old and the fact that he was held in juvenile lockup, which was used for individuals under the age of 18.

¶ 38    Additionally, we can find no error in the trial court's taking judicial notice of the fact that it was a juvenile court, that the juvenile court's jurisdiction ends upon the 21st birthday of anyone who appears before the court, and that respondent stipulated to the juvenile court's jurisdiction at his arraignment. A respondent's age may be established for purposes of proving the age element of an offense when the respondent stipulates to the juvenile court's jurisdiction at his arraignment. *In re O.S.*, 2018 IL App (1st) 171765, ¶ 36; *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶¶ 48-50. "A stipulation is conclusive as to all matters necessarily included in it, [citation] and [n]o proof of stipulated facts is necessary, since the stipulation is substituted for proof and dispenses with the need for evidence [citation]." (Internal quotation marks omitted.) *People v. Woods*, 214 Ill. 2d 455, 469 (2005). A respondent is therefore precluded from attacking or otherwise contradicting any facts to which he or she has stipulated. *Id.*

¶ 39    Here, the fact that respondent was under 21 years of age at the time of the offenses was established when he stipulated to juvenile jurisdiction at his arraignment. *In re O.S.*, 2018 IL App (1st) 171765, ¶ 36; *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶¶ 48-50. Article V of the Act, which concerns delinquency petitions, provides that "[p]roceedings may be instituted under the provisions of this Article concerning any minor who prior to his or her 18th birthday has violated or attempted to violate *** any *** law or ordinance." 705 ILCS 405/5-120 (West 2020). Thus, "by stipulating to juvenile jurisdiction, respondent was stipulating to the fact that

18

he was under 18 years old on the day of the alleged offense." *In re Gabriel W.*, 2017 IL App (1st) 172120, ¶ 48; see also *In re O.S.*, 2018 IL App (1st) 171765, ¶ 36 (finding that the State satisfied its burden of proof as to the respondent's age in part due to the respondent's stipulation as to juvenile jurisdiction at an earlier arraignment).

¶ 40     We find unpersuasive respondent's contention that the trial court was not permitted to take judicial notice of its jurisdiction and respondent's stipulation to it, as the trial court did so after the close of evidence. Respondent relies on *In re S.M.*, 2015 IL App (3d) 140687, in support of this proposition. In that case, however, the respondent had not stipulated to the juvenile court's jurisdiction. See *id.* ¶¶ 21-22 (noting that the respondent's "procedural silence" in failing to file a motion to dismiss the State's juvenile petition could not be construed as a judicial admission). Instead, the fact of which the trial court took notice was the respondent's unsworn statement to the court, in response to direct questioning during arraignment, that he was 16 years old. *Id.* ¶¶ 25-26. In finding that the trial court should not have taken judicial notice of this fact, the appellate court observed that permitting the use of this fact would "prevent the defense from having a meaningful opportunity to rebut the contents or object to the admissibility of the respondent's statement as required by existing case law." *Id.* ¶ 26.

¶ 41     In this case, by contrast, the facts of which the trial court took judicial notice were no longer subject to dispute. See *Woods*, 214 Ill. 2d at 469 (a defendant is generally precluded from attacking or otherwise contradicting any facts to which he has stipulated); see also *In re S.M.*, 2015 IL App (3d) 140687, ¶ 20 ("it is well established that a juvenile court may take judicial notice of its own records"). Our supreme court has found that a court may take judicial notice of a fact that is not subject to reasonable dispute, even where that fact constitutes an element of the offense. *People v. Castillo*, 2022 IL 127894, ¶¶ 41-42. Moreover, a court may take

judicial notice of adjudicative facts at any stage of the proceeding, even for the first time on appeal. *Id.* ¶ 39; Ill. R. Evid. 201(a), (f) (eff. Jan. 1, 2011). Accordingly, we find no error in the trial court taking judicial notice of the fact that it was a juvenile court, that a juvenile court's jurisdiction ends on the individual's 21st birthday, and that respondent had stipulated to juvenile jurisdiction. Thus, between Casey's testimony as to respondent's age and the trial court's taking judicial notice of the above facts, a rational trier of fact could have found that respondent was under the age of 21 beyond a reasonable doubt. We therefore affirm the trial court's delinquency finding with respect to the AUUW count.

¶ 42                                                    *Sentencing*

¶ 43        Respondent's final argument on appeal concerns the trial court's finding that he was a violent juvenile offender. The violent juvenile offender statute is intended to protect " 'society from an individual who has committed two serious violent offenses involving the use or threat of physical force or violence against an individual or possession or use of a firearm.' " *In re Destiny P.*, 2017 IL 120796, ¶ 18 (quoting *In re M.G.*, 301 Ill. App. 3d 401, 409 (1998)). Accordingly, section 5-820 of the Act provides:

> "A minor having been previously adjudicated a delinquent minor for an offense which, had the minor been prosecuted as an adult, would have been a Class 2 or greater felony involving the use or threat of physical force or violence against an individual or a Class 2 or greater felony for which an element of the offense is possession or use of a firearm, and who is thereafter adjudicated a delinquent minor for a second time for any of those offenses shall be adjudicated a Violent Juvenile Offender if:
>
> (1) The second adjudication is for an offense occurring after adjudication on the first; and

> (2) The second offense occurred on or after January 1, 1995." 705 ILCS 405/5-820(a) (West 2020).

If the minor is found to be a violent juvenile offender, the trial court "shall adjudicate the minor a Violent Juvenile Offender and commit the minor to the Department of Juvenile Justice for a period of time as provided in subsection (3) of Section 5-750" (*id.* § 5-820(f)), which, in this case, would be for an indeterminate term terminating upon respondent's 21st birthday (705 ILCS 405/5-750(3) (West 2020)).

¶ 44    In the instant case, the State proved respondent's eligibility to be sentenced as a violent juvenile offender through its introduction of a sentencing order evidencing a prior guilty plea in case No. 20 JD 1243, to which respondent's counsel indicated she had no objection. The sentencing order indicates that, on July 15, 2021, respondent was adjudicated a ward of the court in case No. 20 JD 1243, but does not indicate the offense for which respondent was found guilty. A social investigation report prepared by respondent's probation officer, however, listed the "offense" in case No. 20 JD 1243 as "Armed Robbery, Agg. Robbery, Robbery." We find this evidence to be sufficient to establish respondent's eligibility to be sentenced as a violent juvenile offender.

¶ 45    We find unpersuasive respondent's contention that the admission of the sentencing order was insufficient to prove his prior adjudication, since the order was not certified. Section 5-850 provides that a "duly authenticated copy of the record of any alleged prior adjudication shall be prima facie evidence of the prior adjudication." *Id.* § 5-820(e). Respondent is correct that the sentencing order submitted by the State is not certified and therefore, does not serve as *prima facie* evidence of the prior adjudication. This does not mean, however, that it is not probative as to the matter. When interpreting similar language, our supreme court has

explained that this type of provision creates a permissible rebuttable presumption, in which the State may meet its burden of establishing the applicable sentencing requirements through the introduction of certified records of the defendant's prior convictions. See *People v. Brown*, 229 Ill. 2d 374, 386-88 (2008) (interpreting Habitual Criminal Act (720 ILCS 5/33B-1 (West 2002)). The State remains free, however, to meet its burden through the introduction of any type of evidence. *Id.* at 388.

¶ 46    Here, the State introduced a document, which was admitted into evidence without objection, which demonstrated that respondent had a prior adjudication in case No. 20 JD 1243 on July 15, 2021, which was after January 1, 1995, and prior to the date of the instant adjudications. The social investigation report prepared by respondent's probation officer provided further information as to the case in listing the "offense" in case No. 20 JD 1243 as "Armed Robbery, Agg. Robbery, Robbery," all of which are Class 2 or greater felonies. See 720 ILCS 5/18-1(c) (West 2020) (robbery is a Class 1 felony, while aggravated robbery is a Class 2 felony); 720 ILCS 5/18-2(b) (West 2020) (armed robbery is a Class X felony). Our supreme court has held that a presentence investigation report is "generally a reliable source for the purpose of inquiring into a defendant's criminal history." *People v. Williams*, 149 Ill. 2d 467, 491 (1992); see also *In re Johnathan T.*, 2022 IL 127222, ¶¶ 48-49 (in delinquency proceedings, the Act requires the probation department to prepare a social investigation report instead of a presentence investigation report, and finding the two analogous). Accordingly, between the sentencing order and the social investigation report, the State introduced evidence which established the requirements for violent juvenile offender status. Consequently, the trial court properly sentenced respondent as a violent juvenile offender.

¶ 47                                    CONCLUSION

¶ 48        For the reasons set forth above, we affirm the trial court's adjudication of delinquency, as

well as its sentencing respondent as a violent juvenile offender.

¶ 49        Affirmed.